COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| DAVID MARMOLEJO, | § | |
| | | No. 08-11-00108-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 210th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC#20090D04868) |

## **O P I N I O N**

David Marmolejo ("Appellant" or "Marmolejo") appeals his conviction of murder. Marmolejo brings three issues: (1) legal insufficiency of the evidence to sustain his conviction; (2) error by the trial court in failing to include a mitigation instruction of manslaughter during the punishment phase; and (3) error by denying Marmolejo his right to confront and cross-examine a material witness. For the reasons set out below, we affirm.

## **PROCEDURAL BACKGROUND**

Marmolejo was indicted for murder. The case initially proceeded to trial in October of 2010, but the jury was unable to reach a unanimous verdict and a mistrial was granted. Marmolejo's second trial began in March of 2011. Marmolejo was found guilty of the murder offense alleged in paragraphs A and B of the indictment. Marmolejo elected to go to the jury for

punishment, and was assessed a sentence of fifty-four (54) years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000. Marmolejo timely appealed.

## FACTUAL BACKGROUND

In July of 2009, Gloria Marmolejo ("Gloria"), Marmolejo's mother, was residing in Arizona with her other son Manuel ("Manny") and his wife Jennifer. Gloria allowed Marmolejo to live in her home on Sonoma Street on the eastside of El Paso. Marmolejo was to maintain the home while she was living in Arizona.

Gloria would return monthly to El Paso to check on her home and visit friends and family. On Saturday July 25, 2009, Gloria came to El Paso to make an unannounced visit and check on her home. She wanted to catch Marmolejo off-guard and confirm her suspicion Marmolejo was in a sexual relationship with his stepsister, Mariah Wilson ("Wilson"), and living in her home together. Gloria had made it clear she disapproved of this relationship and would evict Marmolejo if she found Wilson living with Marmolejo in Gloria's home. Gloria specifically asked Manny not to tell Marmolejo she was going to El Paso. Manny and Jennifer described Gloria as growing increasingly more frustrated with Marmolejo. She chastised him for not getting his life together, not paying the bills for her home, and breaking promises to see his nephew. According to Jennifer, Gloria intended to evict Marmolejo if she found Wilson's possessions in her home.

Gloria called her mother, Mary Rodriguez ("Mary"), on Saturday at approximately 8:25 a.m. stating she was on her way to El Paso. She specifically asked Mary not to tell Marmolejo she was coming. Gloria called Mary later that day confirming she had arrived home in El Paso. Mary invited Gloria over for coffee, but Gloria declined saying she could not because the house

2

was filthy and smelled terrible. Gloria told Mary she was going to buy cleaning supplies because she could not sleep in the home unless it was clean. Gloria also complained that she could not get into her bedroom because the lock had been changed. She asked if Mary's husband Sal could come and help her unlock the master bedroom door. Mary said Sal would go over. Shortly after they hung up, Gloria called Mary again. She told Mary not to worry because she had spoken to Marmolejo. He was on his way to unlock the bedroom door for her. Mary estimated these calls took place between 5 and 6 p.m., Saturday evening.[1]

Manny called Gloria at approximately 7:30 p.m. Saturday night because he had not heard from her. Manny stated this was unusual because Gloria always called him to let him know she had made it safely to El Paso. When Manny called, Gloria did not answer; her phone rang repeatedly until it went to voice mail. Manny called his mother again at 9:15 p.m. with no response. The calls from Manny to Gloria's cell phone were confirmed at trial through the testimony of Michelle Lovejoy, a forensic examiner for the FBI.

Conrad Huerta ("Conrad"), Gloria's brother, also called Gloria on Saturday but did not get an answer.[2] At 7:05 p.m. Saturday, Marmolejo called Conrad, wished him a happy birthday and suggested they go out to celebrate, although ultimately they did not. Marmolejo sent a text message about 10 p.m. Saturday night to Conrad and other family members about a possible family cookout at Gloria's house on July 26. Marmolejo called Manny at approximately 11:50 p.m. Saturday night. Manny said this was unusual as Marmolejo normally did not call him late at

---

[1] Gloria's cell phone records, introduced at trial, confirmed the calls with Mary at 8:25 a.m., 5:17 p.m., and 5:21 p.m. El Paso is located in the Mountain Time ("MT") zone and the times of all the calls described herein are MT.

[2] Gloria had called Conrad on July 24 and told him her plan to go to El Paso and evict Marmolejo from the home, but that she did not tell Marmolejo she was coming.

3

night. Manny asked Marmolejo if he had seen Gloria. Marmolejo said yes and he had helped her unload her car. He said Gloria had begun yelling at him because of the condition of the home and other issues. Marmolejo said he then left the house because Gloria was yelling.

Reyna Yanez ("Yanez") was renting a room at Gloria's house from Marmolejo. On Saturday evening, she clocked out of work at 6:12 p.m. and stayed at the mall with a friend until about 9 p.m. While she was at the mall, she received a voice mail from Marmolejo. He advised Yanez that Gloria would be at the house and not to become alarmed if Yanez saw her. Yanez arrived home Saturday evening around 9:15 to 9:20 p.m. and did not see any other cars. The house was dark, so Yanez turned on the light for the staircase and went straight upstairs to her room. Yanez did not see or hear anyone, and her presence did not draw anyone's attention, though Yanez was expecting to see Gloria. Yanez took a shower and waited for her boyfriend, Robert Campos, to come over to watch movies. Sometime after he arrived, between fifteen to forty-five minutes later, around 10:30 p.m., they left the house to get something to eat. After thirty to forty minutes, they returned and went back upstairs to Yanez's room. They watched movies and spent the night in Yanez's room. Neither heard anyone else in the house during that time. They remained in Yanez's room until 9:30 a.m. the next day. Yanez and Campos testified neither saw Gloria, Marmolejo, or Wilson. Further, neither one of them heard anything to indicate anyone else was at the house. They stated they did not see Marmolejo's car, but also admitted neither were paying close attention.[3]

---

[3] In a written statement made to the police, Yanez stated that she thought she saw someone sleeping in one of the upstairs bedrooms, although at trial she testified she might have been mistaken.

At 1:37 a.m.,[4] on Sunday July 26, Akasha Loo ("Akasha"), an ex-girlfriend of Marmolejo who was living in Hawaii, received a phone call from Marmolejo. She testified that although they kept in contact, it was unusual for him to call that late. She recalled he was unnaturally quiet.

At approximately 5:30 a.m. Sunday morning, Gloria's neighbor, Julie Serrano ("Serrano"), saw the garage door of Gloria's house open. She saw someone, believed to be a female, drive Gloria's red Hyundai SUV out of the garage and down the street. Serrano was unable to see the driver and initially assumed it was Gloria. Serrano testified whoever drove the vehicle appeared to be smaller than Marmolejo. Rafael Vargas ("Vargas") was outside with Serrano and corroborated her testimony. Vargas further described the driver as "[s]ome lady like in her 30's or so . . . I just saw like her pale white face and her eyes, like she was scared" and he had no doubt the driver was a woman with "blondish or so" shoulder-length hair. He also testified he thought he saw another person in the back of Gloria's car.

Later on July 26, Manny began calling his mother's cell phone again. Yet again Gloria did not answer and the call went to her voice mail. Conrad, who thought there was a family cookout planned, also called Gloria that Sunday afternoon, but she did not answer. Conrad then called Marmolejo, who told Conrad he had been unable to find out from Gloria whether there would be a family cookout or not. At 9:30 p.m. Sunday evening, Marmolejo told Manny that he had not seen or talked to Gloria.

On Monday July 27, Manny called his mother again, with no response. Given that he could not find anyone who had seen or talked to Gloria, Manny attempted to file a missing-person's report with El Paso Police Department ("EPPD"). He was told he could not file

---

[4] El Paso time (Mountain time zone), however in Hawaii, Akasha received the call at 9:37 p.m. Pacific time.

5

it because he was not the last person to have seen her. Manny then decided to come to El Paso. Manny called Marmolejo prior to leaving for El Paso. Marmolejo reiterated he still had not seen or talked to Gloria. He also told Manny she was not in her room and her car was gone. On Monday afternoon, Mary went to Gloria's house. Marmolejo admitted to Mary he had seen Gloria when she arrived home Saturday evening and had opened the master bedroom door for her. Mary noticed the house did not seem quite as bad as Gloria had described it and it appeared to her to have been cleaned. Conrad, Mary, Sal, and Marmolejo discussed who had seen Gloria last and determined amongst themselves that Marmolejo was the last person to have seen her. Marmolejo made a missing-person's report with the EPPD. As Marmolejo made the report, the other family members were present. Manny, who was still in Arizona, was on the phone and listening. During this initial phone call with EPPD, Marmolejo gave a description of what Gloria was wearing when he last saw her. At trial, Manny stated the description he heard Marmolejo give EPPD that day were the same clothes Gloria was wearing when she left Manny's home Saturday morning. Marmolejo told EPPD, Gloria called him while he was at a movie theater in northeast El Paso. She asked him to come home and let her into the house. He said he came home, unloaded her car, spoke to her briefly, and then returned to the theater.

Manny and Jennifer arrived in El Paso on Tuesday July 28; Marmolejo repeated the story to Manny and Jennifer that he had given EPPD of his last interaction with his mother. Manny observed the master bedroom and it appeared to him as if the room had been tidied. Manny noticed the bed was made. Gloria's suitcase had not been unpacked and her cosmetics bag was still packed on the bathroom counter, all of which were uncharacteristic of Gloria's habits. Marmolejo later told Manny and Mark Huerta ("Huerta"), one of Gloria's brothers, after he left

6

Gloria to return to the movie, she called him again at approximately 5:40 p.m. He said Gloria asked for Yanez's phone number to call her to let her know Gloria would be in the house. Marmolejo repeatedly showed them this call from his mother on his cell phone, insisting the last time he saw Gloria was around 5:40 p.m. Marmolejo told them he returned to the movie theater and afterwards went to a cookout at a friend's house. Marmolejo told Huerta after he left the cookout, he and his date went out to a nightclub. He said he returned to Gloria's home at approximately 3 a.m. Marmolejo also told Manny he was worried the police would consider him a suspect because of a hug and kiss he had given Gloria which could result in his DNA found on her. Manny told Marmolejo it was good Marmolejo had returned to the theater because the security cameras would confirm the time Marmolejo had returned.

When the EPPD detective met with the family on Wednesday July 29, Marmolejo reiterated the same story he had been telling Manny and other family members. However, one detail changed; Marmolejo now said he had returned directly to his friend's cookout and not to the movie theater as he had earlier told family members. Both Manny and Huerta, who were present with Marmalejo when he gave this statement to the EPPD detective, realized Marmolejo had changed his story as to where he went directly after he had left Gloria, which Manny found peculiar and wondered how the story had changed from July 28 to July 29.

Katherine Thompson ("Thompson"), the wife of Marmolejo's friend who hosted the cookout at her house[5] on Saturday July 25, testified she saw Marmalejo earlier that day. She said Marmolejo and Wilson had taken Thompson's sons to a movie in northeast El Paso. Thompson stated Wilson and Thompson's sons returned from the theater later that day, but Marmolejo was

---

[5] Thompson's house is located in northeast El Paso.

not with them. Thompson recalled Wilson was with her and her children at the cookout at her house until Marmolejo arrived back at her house. She did not see Marmolejo until he returned a little before 7 p.m. Saturday night. She said Marmolejo and Wilson left her house together around midnight.

On Wednesday July 29, Gloria's car was found abandoned near an elementary school on the eastside of El Paso. Gloria's purse, including her keys and cell phone, were found inside her car. Following this, the Crimes Against Persons ("CAP") Office of the EPPD became involved and asked family members to give statements.

Marmolejo gave a statement to Detective Joe Ochoa ("Ochoa") Wednesday afternoon, July 29. In part, his statement generally matched what he told an EPPD detective earlier that day. However, the following day, Marmolejo was asked to give a second statement to Detective David Samaniego ("Samaniego") because of inconsistencies in his statements. Marmolejo told Samaniego he was at a movie theater in northeast El Paso when Gloria called him between 5 p.m. and 5:30 p.m. His friend, Skye, drove him back to the Thompson's house so he could retrieve his car. Marmolejo then drove to Gloria's house on the eastside. He told Samaniego when he arrived at the house, Gloria was upset with him. He unlocked the door to the master bedroom for her. Marmolejo told Samaniego that he and Wilson had been sleeping in the master bedroom. Marmolejo was adamant he left Gloria's house at 5:40 p.m. to return to the northeast side of town. Gloria called him shortly after he left her at 5:40 p.m.

Samaniego questioned Marmolejo's timeline and did not believe Marmolejo could have driven the distance from the theater to the Thompson house in northeast El Paso and then on to Gloria's house on the eastside in that time frame. Samaniego and Ochoa checked Gloria's cell

8

phone records and noted she called Marmolejo at approximately 5:14 p.m. They drove Marmolejo's route and timed how long it would take to drive it. Samaniego testified even allowing for a few minutes and driving a little over the speed limit, it still took him thirty-one minutes to drive Marmolejo's route. Samaniego concluded the earliest Marmolejo could have arrived at Gloria's house was 5:49 p.m. If as Marmolejo stated, he unloaded Gloria's car, and then had a discussion with her before he left, he could not possibly have left at 5:40 p.m.

When an EPPD officer was sent to inspect Gloria's house, he found evidence of blood in the garage. Lab tests later identified the blood as belonging to Wilson.

According to Marmolejo's Cricket cell phone records, the following calls for Marmolejo's cell phone on Saturday were as follows:

5:14 p.m.            Incoming call from Gloria to Marmolejo;
                    Marmolejo's cell phone pinged off cell tower 281 in **_northeast_** El Paso.

5:14 p.m.            Call between Gloria and Marmolejo;
                    Marmolejo's cell phone pinged off cell tower 279 in **_northeast_** El Paso.

5:30 p.m.            Outgoing call from Marmolejo to Gloria;
                    Marmolejo's cell phone pinged off cell tower 281 in **_northeast_** El Paso.

5:40 p.m.            Incoming call from Gloria to Marmolejo;
                    Marmolejo's cell phone pinged off cell tower 273 in **_eastside_** El Paso.

6:11 p.m.            Outgoing call from Marmolejo to Wilson;
                    Marmolejo's cell phone pinged off cell tower 251 on the **_eastside_**,
                    Wilson's cell phone pinged off tower 281 in the **_northeast_**.

6:30 to 6:31 p.m.    Call between Marmolejo and Wilson;
                    Marmolejo's cell phone pinged off cell tower 253 on the **_eastside_**,
                    Wilson's cell phone pinged off tower 279 in the **_northeast_**.

6:40 to 6:41 p.m.    Call between Marmolejo and Wilson;
                    Marmolejo's cell phone pinged off cell tower 253 on the **_eastside_**,
                    Wilson's cell phone pinged off tower 282 in the **_northeast_**.

9

| | |
|---|---|
| 6:41 to 6:42 p.m. | Call between Marmolejo and Wilson;<br>Marmolejo's cell phone pinged off cell tower 272 on the *eastside*,<br>Wilson's cell phone pinged off tower 281 in the ***northeast***. |
| 6:44 p.m. | Call between Marmolejo and Wilson;<br>Marmolejo's cell phone pinged off cell tower 272 on the *eastside*,<br>Wilson's cell phone pinged off tower 282 in the ***northeast***. |
| 6:45 p.m. | Call between Marmolejo and Wilson;<br>Marmolejo's cell phone pinged off cell tower 272 on the *eastside*,<br>Wilson's cell phone pinged off tower 282 in the ***northeast***. |
| 6:50 p.m. | Call between Marmolejo and Wilson;<br>Marmolejo's cell phone pinged off cell tower 272 on the *eastside*,<br>Wilson's cell phone pinged off tower 281 in the ***northeast***. |
| 6:54 p.m. | Call between Marmolejo and Wilson;<br>Marmolejo's cell phone pinged off cell tower 253 on the *eastside*,<br>Wilson's cell phone pinged off tower 282 in the ***northeast***. |
| 6:56 p.m. | Outgoing call from Marmolejo;<br>Marmolejo's cell phone pinged off cell tower 272 on the *eastside*. |
| 6:59 p.m. | Outgoing call from Marmolejo;<br>Marmolejo's cell phone pinged off cell tower 272 on the *eastside*. |
| 7:04 p.m. | Outgoing call from Marmolejo;<br>Marmolejo's cell phone pinged off cell tower 273 on the *eastside*. |
| 7:05 p.m. | Outgoing call from Marmolejo;<br>Marmolejo's cell phone pinged off cell tower 273 on the *eastside*. |
| 7:15 p.m. | Outgoing call from Marmolejo;<br>Marmolejo's cell phone pinged off cell tower 281 in the ***northeast***. |

According to Monica Barragan, a customer-service manager for Cricket, in the series of calls between Marmolejo and Wilson around 6:30 p.m., Marmolejo's cell phone consistently pinged off the eastside towers, while Wilson's phone pinged off the northeast towers. Barragan testified the Saturday night calls made by Marmolejo from approximately 7:24 p.m. to 10:28 p.m. pinged off the northeast cell towers, and a series of calls from approximately 11:21 p.m. until

12:29 a.m. early Sunday morning pinged off the eastside towers.

However, Barragan testified that the call Marmolejo made at 1:37 a.m. on July 26 pinged off cell tower 191, located in Anthony, Texas and adjacent to Anthony, New Mexico. Barragan further testified about a series of calls between Marmolejo and Wilson from approximately 5:30 a.m. to 5:49 a.m. on July 26 in which both of their phones pinged off the eastside towers. On cross-examination, Barragan testified the call records do not indicate the location of a handset in relation to any cell site and do not indicate which was the closest tower to the handset.

Soon after Marmolejo's cell phone records were obtained on July 31, Gloria's badly decomposed body was found in a desert area in New Mexico. The medical examiner who performed the autopsy determined the cause of death was asphyxia due to ligature strangulation. Marmolejo's cell phone records indicate the 1:37 a.m. Sunday morning call to his ex-girlfriend, Akasha, pinged from cell phone tower 191. Gloria's body was found approximately thirteen miles (about a ten minute drive) from tower 191. At trial, the EPPD crime-scene technician testified there are several different routes from Gloria's house on the eastside to where her body was found. According to the technician, the most deserted route is through the Anthony Gap, which passes by cell tower 191. He calculated the drive time from Gloria's house on the eastside to the location of her body through the Anthony Gap takes about one hour.

Marmolejo's vehicle was processed for evidence by an EPPD crime-scene technician, who discovered hair samples in the interior of the vehicle which were consistent with Gloria's hair. Comparisons of the sand from the location of the body to sand samples found in Marmolejo's vehicle did not reveal a match. Marmolejo was subsequently arrested for the murder of his mother. Following his arrest, Marmolejo was administered the *Miranda* warnings, voluntarily

waived his rights, and gave a statement which was video-recorded and admitted into evidence. In the video, he was questioned by Ochoa about the inconsistencies in his story and the events surrounding Gloria's murder. Portions of the video clips included the following: Marmolejo denying making the 1:37 a.m. call but stating he often called Akasha around that time, and Marmolejo speculated the four phone calls made around 5:30 a.m. happened when Wilson rolled over onto his phone while they were asleep. In the video, Ochoa noted one of those calls lasted one minute and twenty-five seconds and Wilson would have had to have rolled over onto her phone as well as his phone to simultaneously answer the inadvertent call she had placed. Marmolejo responded if Wilson heard her phone ringing it was possible she had just answered it herself. In the video, Marmolejo agreed with Ochoa that because Gloria's body was found wearing the same clothes she had traveled to El Paso in, it would indicate she was murdered on Saturday July 25. He acknowledged he was at the house that evening and stated July 25 was "the day that something happened to my mother."

At trial, the State presented testimony from FBI Special Agent David Magnuson ("Magnuson"), a member of the Cellular Analysis Survey Team, a team of ten special agents from around the nation who are specially trained in analyzing cell phone records, to testify about the results of his forensic analysis of the cell phone records of Marmolejo, Gloria, and Wilson. Magnuson said based on his analysis, from 6:11 p.m. to 6:59 p.m. on Saturday July 25, Marmolejo's cell phone consecutively pinged from the cell towers on the eastside of El Paso, while Mariah's phone consecutively pinged from the cell towers in the northeast of El Paso during that same time period. Magnuson compiled a summary of the locations and/or activity of Marmolejo's, Gloria's, and Wilson's phones at different times during Saturday evening of July 25

12

and Sunday morning of July 26.   Specifically, Magnuson determined that:

| | |
|---|---|
| 5:00 to 5:15 p.m. | Marmolejo's and Wilson's cell phones were located in the *northeast* area, Gloria's cell phone was in the eastside area. |
| 5:40 p.m. | Marmolejo's cell phone was at Montana and Joe Battle on the *eastside*, Gloria's cell phone was in the eastside area with no further activity, no activity on Wilson's cell phone. |
| 6:11 to 6:59 p.m. | Marmolejo's cell phone was in the *eastside* area, no activity on Gloria's cell phone, Wilson's cell phone was in the northeast area. |
| 7:15 p.m. | Marmolejo's cell phone was in the *northeast* area, no activity on Gloria's or Wilson's cell phones. |
| 10:30 p.m. | Marmolejo's cell phone was in the *northeast* area, no activity on Gloria's or Wilson's cell phones. |
| 12:30 a.m. | Marmolejo's cell phone was in the *eastside* area, no activity on Gloria's or Wilson's cell phones. |
| 1:07 a.m. | Wilson's cell phone was at Loop 375 near the *northeast*, no activity on Gloria's or Marmolejo's cell phones. |
| 1:37 a.m. | Marmolejo's cell phone was in *Anthony*, no activity on Gloria's or Wilson's cell phones. |
| 5:30 to 5:49 a.m. | Marmolejo's and Wilson's cell phones were in the *eastside* area, no activity on Gloria's cell phone. |

Magnuson testified that he could state with certainty that the 1:37 a.m. phone call Marmolejo made to his ex-girlfriend did not ping off of any towers in northeast El Paso or eastside El Paso.

**DISCUSSION**

Marmolejo brings three issues:  (1) legal insufficiency of the evidence to sustain his conviction; (2) error by the trial court by failing to include a mitigation instruction of manslaughter during the punishment phase; and (3) error by denying Marmolejo his right to confront and

13

cross-examine a material witness.

## Legal insufficiency

Marmolejo first challenges that the evidence presented was insufficient to support his conviction. Specifically, he argues the evidence did not prove his identity as the killer; the State's case against him was premised solely on evidence of motive and opportunity; and "[t]he State also had to rely upon a pyramiding of inferences to establish defendant's guilt." Marmolejo asserts that the jury had to draw two inferences: First, Marmolejo had motive to kill Gloria and lied about his whereabouts at the time his mother was determined to be missing, which leads to the second inference that he was guilty of murdering Gloria.[6]

## Applicable law and standard of review

In *Brooks v. State*, the Court of Criminal Appeals abandoned factual sufficiency review in those cases where the burden of proof is beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010)(finding no meaningful distinction between the legal and factual sufficiency standards and no justification for retaining both standards, therefore overruling the factual sufficiency review adopted in *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996)). The legal sufficiency standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), is the only standard a reviewing court applies in determining whether the evidence is sufficient to support a conviction. *Brooks*, 323 S.W.3d at 894-95. Therefore, we will review the evidence under the *Jackson* legal sufficiency standard and determine whether the evidence is sufficient to support the challenged elements beyond a

---

[6] Marmolejo's argument of the "pyramiding inferences" is essentially a complaint that his conviction is based on impermissible inference-stacking. The Court of Criminal Appeals discussed this in *Hooper*, noting that inference stacking has been replaced with the *Jackson* legal sufficiency standard. *Hooper*, 214 S.W.3d at 15.

14

reasonable doubt. *See Brooks*, 323 S.W.3d at 894-95, *citing Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

When reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007)(same). Under a legal sufficiency review, we may not substitute our judgment for that of the jury, who is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App. 2007). We therefore defer to the jury's resolution of these issues and to its responsibility to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13, *citing Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89. In resolving what the facts are and what reasonable inferences may be drawn from them, the jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony, even if uncontradicted. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000), *overruled on other grounds*, *Laster v. State*, 275 S.W.3d 512 (Tex.Crim.App. 2009); *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008)("[T]he jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony."). In analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton*, 235 S.W.3d at 778, *citing Hooper*, 214 S.W.3d at

15

16-17. Our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Id.* Direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W. 3d at 13.

As it applies to the instant case, a person commits the offense of murder if he intentionally or knowingly causes the death of an individual, or, with the intent to cause serious bodily injury, commits an act clearly dangerous to human life that causes the death of an individual. *See* TEX.PENAL CODE ANN. § 19.02(b)(1)-(2)(West 2011). Murder convictions have been affirmed based solely on inferences raised by circumstantial evidence. *See, e.g., King v. State*, 29 S.W.3d 556, 564-65 (Tex.Crim.App. 2000)(affirming capital murder conviction where case was comprised of wholly circumstantial evidence). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. The identity of a perpetrator can be shown by either direct or circumstantial evidence. *Dimas v. State*, 14 S.W.3d 453, 458 (Tex.App.--Beaumont 2000, pet ref'd).

### Application of law to facts

The record reflects Gloria was most likely murdered somewhere between 5:40 p.m. and 7:30 p.m. on Saturday July 25, 2009. Mary testified she spoke to Gloria at 5:21 p.m., Gloria told her Marmolejo was on his way over to let her into the bedroom. Other family members and friends testified Gloria would almost always call when she arrived in El Paso, but they received no

16

such calls when Gloria arrived on July 25 and never heard from her thereafter. On the evening of July 25, Manny called Gloria at 7:30 p.m. and 9:15 p.m. but she never answered.[7] Though it was her customary practice to immediately unpack her belongings whenever she traveled, Gloria's suitcases and cosmetics bag were never unpacked. Marmolejo told different family members and EPPD he saw Gloria when she arrived in El Paso. Therefore, at the very least, Marmolejo knew she was alive at 5:40 p.m., and in his recorded statement, he believed she was murdered on July 25. The State's evidence showed Gloria's last phone call was placed at 5:40 p.m. At 9:15 to 9:20 p.m., when Yanez arrived at the home, there did not appear to be anyone in the house. From this evidence, a reasonable jury could have inferred that Gloria was murdered sometime between 5:40 p.m. and 7:30 p.m. on Saturday July 25.

Marmolejo was the last person to see Gloria alive. He continuously stated he left Gloria's home at 5:40 p.m. and returned to northeast El Paso, but the State presented evidence to the contrary. Detective Samaniego testified it was not possible for Marmolejo to have left the movie theater in northeast El Paso at 5:14 p.m. and arrived at Gloria's house on the eastside of El Paso, proceed to unload her car, have a discussion with her, and then leave her house by 5:40 p.m. Marmolejo initially told family members he had returned to the movie theater directly after leaving Gloria's house. Marmolejo, independently and without any prompting, voiced his concern to his brother, Manny, about his DNA being possibly found on his mother and becoming a potential suspect. Manny assured Marmolejo the movie theater security cameras would record his return to the movies and help him substantiate his story. The following day, Marmolejo told EPPD he had returned directly to Thompson's house. Thereafter, Marmolejo consistently told EPPD he had

---

[7] These call times were substantiated with exhibits presented at trial.

left his mother's house on the eastside at 5:40 p.m. and returned to the cookout at Thompson's house in northeast El Paso and not to the theater as he had previously told Manny and Conrad. Thompson testified Marmolejo did not return with Wilson and Thompson's children from the movie earlier on Saturday, but arrived at her house close to 7 p.m. Cell phone records, along with Magnuson's testimony, show from 5:40 p.m. to 7:05 p.m., Marmolejo's cell phone pinged from the eastside towers. Marmolejo's cell phone records directly contradict his assertion he left the eastside of El Paso at 5:40 p.m. and returned directly to the Thompson's house in northeast El Paso. The cell phone records show Marmolejo's cell phone was in east El Paso at 5:30 p.m. and did not return to northeast El Paso until 7:15 p.m. All his calls during the interim were either placed or received on the eastside of El Paso. This is circumstantial evidence that shows Marmolejo was at the house when Gloria was murdered, and a jury could reasonably infer that Marmolejo murdered Gloria. *See, e.g. Thompson v. State*, -- S.W.3d --, No. 01–10–00398–CR, 2012 WL 668937, *4-7 (Tex.App.--Houston [1st Dist.] 2012, pet. ref'd)(holding the evidence legally sufficient to support jury verdict finding appellant guilty of murder where evidence included appellant's cell phone records indicating that his phone was located near the murder scene until the time of the shooting, then the phone moved towards appellant's residence on the other side of town). This evidence, along with showing Marmolejo was at or near the scene of the murder, further strengthens the reasonable inference Marmolejo murdered Gloria because Marmolejo misrepresented his actual whereabouts during the time of the murder. *See Lozano v. State*, 359 S.W.3d 790, 814 (Tex.App.--Fort Worth 2012, pet. ref'd)("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are also probative of wrongful conduct and are circumstances of guilt."), *citing Gear v. State*, 340 S.W.3d 743, 747

18

(Tex.Crim.App. 2011)(recognizing that fact finder can consider a defendant's untruthful statement as affirmative evidence of guilt); *Couchman v. State,* 3 S.W.3d 155, 163-64 (Tex.App.--Fort Worth 1999, pet. ref'd)(reasoning that a jury can infer that a defendant demonstrated "consciousness of guilt" by lying about events surrounding the alleged crime); *Torres v. State*, 141 S.W.3d 645, 662 (Tex.App.--El Paso 2004, pet. ref'd)(holding, in a circumstantial-evidence case, that the cumulative force of all the surrounding facts and incriminating circumstances was sufficient to support the jury's conclusion of guilt).

Furthermore, "[m]otive is a significant circumstance indicating guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004)(noting that appellant had motive to murder his wife because he was involved in a long-standing affair, his mistress gave him an ultimatum, and appellant did not want to divorce his wife). According to trial testimony, Gloria's intent in coming to El Paso unannounced was to catch Marmolejo off-guard and confirm her suspicion he was having a sexual relationship with Wilson and living with her in Gloria's house. Gloria repeatedly requested Marmolejo not be told of her impending visit to him. The State presented evidence Gloria did not like her step-daughter Wilson and disapproved of the sexual relationship between Marmolejo and Wilson. Further, Gloria's family members believed if Gloria caught Wilson at her home, Gloria would evict Marmolejo. The evidence showed Wilson had been living at the home with Marmolejo while Gloria was living in Arizona. This evidence supports an inference Marmolejo had a motive to kill Gloria and is circumstantial evidence which tends to support a conclusion that he murdered her. *C.f. Lopez v. State*, 200 S.W.3d 246, 251-52 (Tex.App.--Houston [14th Dist.] 2006, pet. ref'd)(holding that evidence that appellant had disdain for his baby and saw baby as interfering with his relationship with his girlfriend was relevant and

19

admissible as evidence of motive to kill his baby).

The State presented evidence that shows Marmolejo disposed of Gloria's body in the New Mexico desert. Marmolejo told EPPD, after he and Wilson left the cookout at Thompson's house, they went to Gloria's house arriving there at 1:30 a.m. early Sunday morning and slept until approximately 11 a.m. that morning. Marmolejo told Huerta he had returned to Gloria's house at 3 a.m. Sunday morning, July 26. Akasha testified that she received a phone call from Marmolejo at 1:37 a.m. on Sunday July 26. This 1:37 a.m. phone call from Marmolejo's cell phone pinged from a cell tower in Anthony, number 191, approximately thirteen miles from where Gloria's body was discovered. Testimony by an EPPD crime-scene technician demonstrated the most deserted route from Gloria's house to the desert area where her body was found is through Anthony Gap, which passes by cell tower 191. Disposal of the body is an attempt to cover up a crime and evinces a consciousness of guilt. *Guevara*, 152 S.W.3d at 50 ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."). A reasonable jury could infer from the evidence Marmolejo was the person who disposed of Gloria's body and tends to support the jury's verdict. *See e.g. Thompson*, -- S.W.3d --, 2012 WL 668937 at *4.

Marmolejo affirmatively stated to EPPD he and Wilson were sleeping in the early hours of Sunday morning, July 26. However, the jury was free to consider Marmolejo's statements in conjunction with Serrano and Vargas's observations at 5:30 a.m. Sunday of Gloria's car driven out of the garage by a woman that was not Gloria. Marmolejo's cell phone records show numerous calls placed between Marmolejo and Wilson from 5:30 a.m. to 5:49 a.m. Sunday morning, July 26. Marmolejo explained those phone calls to Detective Ochoa by insisting Wilson had rolled over his

20

cell phone causing it to call her cell phone. When the one minute and twenty-five second phone call was pointed out to Marmolejo, he speculated Wilson could have answered her own phone as she rolled over on to his cell phone in her sleep. The cell phone records for Wilson and Marmolejo show those phone calls in the early Sunday morning hours of July 26 pinged from eastside towers. Gloria's car was found on the eastside of El Paso on July 29.

In addition, Marmolejo initially misrepresented the true nature of his relationship with Wilson to the EPPD, and told them that the subject of his sexual relationship with Wilson never came up in his discussion with Gloria. In his video-recorded statement, Marmolejo denied making the 1:37 a.m. call to his ex-girlfriend.

As the sole judge of the credibility of witnesses and weight, a rational fact finder is entitled to consider these statements, in connection with the other circumstances of the case, as affirmative evidence of guilt. *See Padilla v. State*, 326 S.W.3d 195, 201 (Tex.Crim.App. 2010)(rational fact finder can consider a defendant's untruthful statements, in connection with the other circumstances of the case, as affirmative evidence of the defendant's guilt); *Guevara*, 152 S.W.3d at 50. Marmolejo's attempts to dispose of evidence of his crime and his implausible explanations concerning his whereabouts can be seen as evincing a consciousness of guilt, and is evidence from which a jury could reasonably infer he killed Gloria. *See, e.g. Guevara*, 152 S.W.3d at 50.

Viewing all the evidence in the light most favorable to the verdict, and presuming that the jury resolved conflicts of the evidence in favor of the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, that Marmolejo either intentionally or knowingly caused Gloria's death, or, with the intent to cause serious bodily injury, committed an act so dangerous to human life as that caused her death. Marmolejo's first issue is overruled.

21

**Error in failing to instruct jury on manslaughter**

Next, Marmolejo contends the trial court erred by failing to include a sudden-passion instruction in the jury charge during the punishment phase. Marmolejo's counsel had made a request to include this charge, but the trial court denied the requested instruction. Marmolejo argues the State's evidence of his possible motive to murder Gloria, that is Gloria's intent to evict Marmolejo due to his relationship with Wilson, opened the door to a sudden-passion issue. Specifically, Marmolejo argues that "[i]t follows, a fortiori, that this evidence also supports a jury instruction on the jury mitigation charge of voluntary manslaughter – sudden passion arising from adequate cause."

Marmolejo's defensive theory at trial was Wilson had committed the murder. This theory was introduced during the opening statement of the guilt-innocence phase. Marmolejo's trial counsel cross-examined witnesses regarding the possibility Wilson had murdered Gloria, including finding blood at Gloria's house that matched Wilson's DNA and a cut on Wilson's finger. Counsel maintained this defensive theory in closing arguments of the guilt-innocence phase. During closing arguments in the punishment phase, however, counsel argued if the jury believed Marmolejo murdered his mother, then he "snapped" and commited it in sudden passion and the appropriate punishment would be on the lower end of the range of punishment.

We review charge error on appeal by determining whether error occurred, and if so, whether that error caused sufficient harm to require reversal. *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex.Crim.App. 2005). The degree of harm required for reversal depends on whether the defendant preserved error at trial. *Id*. at 743. When the defendant preserves error at trial by timely objection, as in the instant case, the record must establish only "some harm" to obtain

22

reversal. *Ngo*, 175 S.W.3d at 743, *citing Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1985)(op. on reh'g). In contrast, when the defendant fails to preserve error at trial, the record must demonstrate "egregious harm" to obtain reversal. *Id*. at 743–44, *citing Almanza*, 686 S.W.2d at 171.

During the punishment phase of the trial, a defendant may argue that he caused the death while under the immediate influence of sudden passion arising from an adequate cause. *McKinney v. State*, 179 S.W.3d 565, 569 (Tex.Crim.App. 2005). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id*. at 569*, citing* TEX.PENAL CODE ANN. § 19.02(a)(2). "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.*, *citing* TEX.PENAL CODE ANN. § 19.02(a)(1).

Sudden passion is a mitigating circumstance that if found by the jury to have been proven by a preponderance of the evidence, reduces the offense from a first degree felony to a second degree felony. *Id., citing* TEX.PENAL CODE ANN. § 19.02(c) and (d). Therefore, before a defendant is allowed a jury instruction on sudden passion, he must prove that there was an adequate provocation, that a passion or an emotion such as fear, terror, anger, rage, or resentment existed, that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide. *Id*. Ordinary anger is not adequate cause. *See Ybarra v. State*, 890 S.W.2d 98, 109 (Tex.App.--San Antonio 1994, pet. ref'd).

23

A jury should receive a sudden passion charge if it is raised by the evidence, even if that evidence is weak, impeached, contradicted, or unbelievable. However, the evidence cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury. *McKinney*, 179 S.W.3d at 569.

Legally adequate cause requires some evidence of the condition of the accused's mind at the time of the offense. *Merchant v. State*, 810 S.W.2d 305, 310 (Tex.App.--Dallas 1991, pet. ref'd). "'Sudden passion' requires first that the record contain objective evidence that direct provocation by the victim or someone acting with the victim occurred at the time of the killing." *Naasz v. State*, 974 S.W.2d 418, 423-24 (Tex.App.--Dallas 1998, pet. ref'd), *citing Merchant*, 810 S.W.2d at 310. "The record must also contain evidence from which the jury could subjectively decide the accused killed the victim while in an excited and agitated state of mind arising out of the direct provocation." *Naasz*, 974 S.W.2d at 424, *citing Merchant*, 810 S.W.2d at 310. The defendant must prove sudden passion by a preponderance of the evidence. *See* TEX.PENAL CODE ANN. § 19.02(d); *McKinney*, 179 S.W.3d at 569; *see also Hernandez v. State*, 127 S.W.3d 206, 211-12 (Tex.App.--Houston [1st Dist.] 2003, pet. ref'd)(holding that defendant bears burden at punishment phase to prove issue of sudden passion by preponderance of evidence).

Marmolejo points to the State's argument and evidence which he believes support the inclusion of a sudden passion charge. However, he misstates the burden in this issue, which rests on Marmolejo to prove "sudden passion" by a preponderance of the evidence of the condition of his mind at the time of the offense. To support his argument, Marmolejo directs the court to examine the State's closing argument during his guilt-innocence phase. The State argued Marmolejo's motive for killing Gloria, was her coming home, unannounced, finding Wilson living

24

there, and evicting Marmolejo. Marmolejo contends this argument is derived from the testimony of Detective Ochoa, in the statement given by Marmolejo about the topics Marmolejo discussed with Gloria the last time he saw her. He also points to the portion of the video-recorded statement where Ochoa asked Marmolejo how Gloria felt about his relationship with Wilson.

The facts are set out extensively above. Marmolejo must prove by a preponderance of evidence: (1) he killed his mother; (2) that she provoked him and it was an adequate cause; (3) Marmolejo was gripped by a passion or emotion such as fear, terror, anger, rage, or resentment; (4) he killed her under the influence of passion or emotion such as fear, terror, anger, rage, or resentment and had no reasonable opportunity for the passion to cool; and (5) there was a causal connection between the provocation, the passion, and the homicide. Marmolejo failed to carry this burden. There is no evidence to show Marmolejo acted under sudden passion. Further, Marmolejo fails to point to any evidence to show he was provoked by a legally adequate cause. The jury found Marmolejo murdered Gloria. The evidence indicates Gloria was killed possibly because she confronted Marmolejo about his relationship with Wilson and threatened to evict him. This evidence of Marmolejo's possible motive does not in and of itself suggest he harbored the requisite degree of anger, resentment, rage, or terror which would have rendered him incapable of cool reflection. *See Saldivar v. State*, 980 S.W.2d 475, 506 (Tex.App.--Houston [14th Dist.] 1998, pet. ref'd)(holding that while appellant's written statement shows that complainant provoked appellant's anger by telling her about various accusations and that they argued over her continued employment, it does not reflect evidence of the extreme emotional and psychological state defining sudden passion or adequate cause, and that "[s]hooting an employer and friend in the back as she walks away from an argument is not an objectively common response in an ordinary

25

reasonable person.").

The evidence in the record is insufficient to support such an instruction and the trial court did not err in refusing to submit such an instruction. *See Saldivar*, 980 S.W.2d at 506 (holding that there was no error in refusing requested instruction where appellant's written statement did not raise the issue of sudden passion from adequate cause). Marmolejo's second issue is overruled.

### Violation of right to confront and cross-examine witness

In his third issue, Marmolejo contends the State placed the credibility of Wilson into issue by admitting declarations from Wilson through the testimony of Estrella Pulido ("Pulido"). At trial, Pulido testified she had met Wilson when they were both employed at Hooters. Wilson introduced Marmolejo as her boyfriend to Pulido and once a week, the three would go out for drinks. Pulido testified she recalled Wilson saying she had moved into Gloria's house, and confirmed she saw women's clothes in the master bedroom when Pulido visited the house. The State asked her about the relationship between Wilson and Marmolejo:

> Q: Ms. Pulido, can you describe for me how you would qualify or how you would describe the relationship between David and Mariah?
>
> A: They had a relationship where David, I guess you could say would wear the pants. Whatever he said Mariah would do. If he said – if he told Mariah not to drink she wouldn't drink. He would send Mariah to sleep when he thought she should go to sleep.
>
> Q: So David would tell her what to do?
>
> A: Yes.

On cross-examination, Pulido testified that it appeared to her Wilson was infatuated with Marmolejo.

26

Mariah Wilson had executed an immunity agreement with the State in exchange for her testimony. However, the State did not call her as a witness. On the last day of the guilt-innocence phase, counsel for Marmolejo requested the defense be allowed to offer into evidence Wilson's immunity agreement. Defense counsel specifically stated he just wanted to admit the agreement into evidence and the fact she had received immunity from the State, and may possibly call Detective Ochoa to testify about the agreement. Marmolejo's counsel stated Marmolejo would not call Wilson as a witness, but just wanted to introduce the "bare fact" she had received immunity. The State objected on the grounds the immunity agreement was not relevant and could not be offered for impeachment, particularly as Wilson did not testify. The trial court sustained the objection.

Marmolejo argues that admitting the declarations of Wilson through Pulido's testimony, the State has placed Wilson's credibility at issue. Marmolejo contends the State "sought and received the benefit of the Mariah Wilson declarations and evidence," but was allowed to circumvent Marmolejo's 6th Amendment right to confront and cross-examine Wilson, implicating his rights under Rule 806.[8] Marmolejo asks for a new trial due to the trial court's denial of his right to confront Wilson. He asserts he attempted to "impeach the Mariah Wilson evidence as to Wilson's actions, bias and motivations during the events described."

The Sixth Amendment's Confrontation Clause provides an accused has the right, in all

---

[8] We note that no objection was made pursuant to the Confrontation Clause of the 6th Amendment or to Rule 806 either during Pulido's testimony, or when Marmolejo requested to admit the immunity agreement. On appeal, an appellant's argument must conform to the objection raised at trial; failure to do so results in a waiver of those arguments. TEX.R.APP.P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex.Crim.App. 2002). We also note that no reason was given as to why Marmolejo sought to introduce the agreement, potentially waiving error on this point. *See Ott v. State*, 627 S.W.2d 218, 222 (Tex.App.--Fort Worth 1981, pet. ref'd)(holding that error was waived where appellant failed at all times to inform the court as to the reasons, if any, for admissibility of impeachment testimony). Nevertheless, we will consider this argument in the interests of justice.

criminal prosecutions, to be confronted with the witnesses against him. U.S. CONST. AMEND. VI. Each Confrontation Clause issue must be weighed on a case-by-case basis, carefully taking into account the defendant's right to cross-examine and the risk factors associated with admission of the evidence. *Lopez v. State*, 18 S.W.3d 220, 222 (Tex.Crim.App. 2000), *citing Hoyos v. State,* 951 S.W.2d 503, 510 (Tex.App.--Houston [14th Dist.] 1997), *aff'd,* 982 S.W.2d 419 (Tex.Crim.App. 1998). The Confrontation Clause is not invoked unless the statements are testimonial in nature. *See Infante v. State,* -- S.W.3d --, 2012 WL 6754834, *5 (Tex.App.--Houston [1st Dist.] 2012, no pet.)("The Confrontation Clause does not apply to all out-of-court statements introduced at a trial; it applies only to hearsay that is 'testimonial' in nature."), *citing Sanchez v. State,* 354 S.W.3d 476, 485 (Tex.Crim.App. 2011); *Crawford v. Washington*, 541 U.S. 36, 51-52, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004). The question whether a particular statement is "testimonial" is still being defined in the courts, but generally such statements "tend to appear more formal and more similar to trial testimony than non-testimonial statements."[9] *Sanchez*, 354 S.W.3d at 485. Trial courts maintain broad discretion to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence. *Lopez*, 18 S.W.3d at 222.

---

[9] The United States Supreme Court has identified a "core class of 'testimonial' statements:"

• ex parte in-court testimony or its functional equivalent "such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;"
• extrajudicial statements "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and
• "statements that were made under circumstance which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1364.

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX.R.EVID. 801(d). Rule 806 provides that "[w]hen a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked . . . by any evidence which would be admissible for those purposes if declarant had testified as a witness." TEX.R.EVID. 806.

A trial court's admission or exclusion of evidence is reviewed for an abuse of discretion. *Torres v. State*, 71 S.W.3d 758, 760 (Tex.Crim.App. 2002). We will not reverse a trial court's evidentiary determination unless that determination falls outside of the zone of reasonable disagreement. *Id*. A trial court abuses its discretion if it acts without reference to any rules or guiding principles, *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App. 1990), or if its ruling goes beyond the zone of reasonable disagreement. *Walker v. State*, 300 S.W.3d 836, 844 (Tex.App.--Fort Worth 2009, pet. ref'd). While a defendant has a constitutional right to cross-examine a witness, the trial court maintains broad discretion to impose reasonable limits on that cross-examination. *See Lopez*, 18 S.W.3d at 222. Defendants are generally entitled to cross-examine a witness by inquiring into any area which is reasonably calculated to show a witness's motive, bias, or interest in testifying. *Carroll v. State*, 916 S.W.2d 494, 497 (Tex.Crim.App. 1996). However, the extent to which a defendant might cross-examine a witness to establish bias rests within the sound discretion of the trial court.[10] *Ramirez v. State*, 976 S.W.2d 219, 223 (Tex.App.--El Paso 1998, pet. ref'd).

---

[10] We also note that a defendant does not have an absolute constitutional right to impeach the general credibility of a witness in any fashion he chooses. *See Hammer v. State*, 296 S.W.3d 555, 562 (Tex.Crim.App. 2009). While the Confrontation Clause guarantees an opportunity for effective cross-examination, trial courts have the discretion to limit cross-examination as inappropriate for any number of reasons. *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex.Crim.App. 1998), *citing Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Smith v. State*, 352 S.W.3d 55, 64 (Tex.App.--Fort Worth 2011, no pet.).

29

We first note that Wilson was listed as a potential witness by the State, and even so, Marmolejo affirmatively told the court he was not going to call her as a witness, but merely wanted to introduce her immunity agreement into evidence. Our review of Pulido's testimony only indicates two possible statements that may involve hearsay: Pulido's testimony that Wilson introduced Marmolejo as her boyfriend, and Pulido's recollection Wilson stating she had moved into Gloria's house.[11] Assuming, *arguendo*, that these statements were hearsay, we hold that the trial court did not abuse its discretion by excluding Wilson's immunity agreement to impeach these statements. These statements certainly do not reach the "formal" level noted in *Sanchez* and *Crawford* that would raise them to the level of "testimonial" statements, such that they would implicate the Confrontation Clause. These statements are more appropriately non-testimonial in nature. *See Davis v. State*, 169 S.W.3d 660, 667 (Tex.App.--Austin 2005)(holding that casual remarks to acquaintances are generally non-testimonial), *aff'd* 203 S.W.3d 845 (Tex.Crim.App. 2006); *Woods v. State*, 152 S.W.3d 105, 114 (Tex.Crim.App. 2004)(casual remarks spontaneously made to acquaintances are nontestimonial).

Marmolejo asserts he wanted to impeach this evidence as to Wilson's actions, bias, and motivation. However, these two statements were already supported by other testimony presented throughout the trial. Mary testified that she saw signs that Wilson was living at the house, where Mary found used women's underwear and a bank statement with Wilson's name on it at the house. Yanez testified she had seen Wilson at the home once or twice during the three weeks Yanez

---

[11] Marmolejo suggests Pulido's testimony about the nature of the relationship between him and Wilson was hearsay and opened the door for admission of the plea agreement. We disagree, as Pulido's description of Marmolejo and Wilson's relationship does not meet the plain definition of "hearsay" set out in Rule 801(d), as they were not statements made by someone other than the declarant but rather Pulido's conclusions based on her observations of the interactions between Marmolejo and Wilson.

30

resided at the house before July 25. Yanez stated she met Marmolejo through Wilson, as they worked at Hooters. Akasha testified Marmolejo and Wilson had an intimate relationship. Huerta testified he suspected Wilson and Marmolejo were dating but the family did not talk about it, and he had seen Wilson at Gloria's house while Marmolejo lived there. Thompson testified she suspected Marmolejo and Wilson were dating but were secretive about it. In the written statement given to the EPPD on July 29, Marmolejo stated he and Wilson "are close friends but don't date each other," yet after leaving Thompson's house, he brought Wilson to Gloria's house and they slept in the same room together. We conclude that the proffered evidence of the immunity agreement would not have been relevant or material relating to the alleged hearsay, particularly as these statements are first, non-testimonial and therefore do not implicate the Confrontation Clause. Further, the alleged hearsay statements are merely cumulative of similar, non-hearsay evidence establishing the same facts. The decision of the trial court to exclude this proffered evidence falls within the "zone of reasonable disagreement." Marmolejo's final issue is overruled.

## CONCLUSION

Having overruled each of Marmolejo's issues, the judgment of the trial court is affirmed.


April 30, 2013

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

(Do Not Publish)

31